ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
CRAIG W. SMITH (164886)
csmith@robbinsllp.com
SHANE P. SANDERS (237146)
ssanders@robbinsllp.com
EMILY R. BISHOP (319383)
ebishop@robbinsllp.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA CECILIA LORCA, Derivatively on Behalf of ALTRIA GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM F. GIFFORD, JR., HOWARD A. WILLARD III, KEVIN C. CROSTHWAITE, JR., JUUL LABS, INC., KEVIN BURNS, RIAZ VALANI, and NICHOLAS J. PRITZKER, <br><br> Defendants, <br><br> -and- <br><br> ALTRIA GROUP, INC., a Virginia Corporation, <br><br> Nominal Defendant. | Case No.: <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Aiding and Abetting, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Altria Group, Inc. ("Altria" or the "Company") against certain of current and former fiduciaries, and those that aided and abetted those fiduciaries, for breaches of fiduciary duties and violations of law. These wrongs resulted in hundreds of millions of dollars in damages, including damages to Altria's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Altria to billions of dollars in potential liability for violations of state and federal law.

2. Altria is a holding company that produces and markets tobacco and other related products through its wholly owned subsidiaries. The Company offers cigarettes primarily under the Marlboro brand, cigars under the Black & Mild brand, and moist smokeless tobacco products under the Copenhagen, Skoal, Red Seal, and Husky brands. Altria sells its products primarily to wholesalers and distributors, large retail organizations, and chain stores, as well as the armed services.

3. On December 20, 2018, Altria announced that it signed and closed a significant investment in defendant JUUL Labs, Inc. ("JUUL"), the purported U.S. leader in electronic vapor ("e-vapor") and electronic cigarette ("e-cigarette," the use of which is commonly referred to as "vaping") products. Specifically, the Company purchased $12.8 billion worth of JUUL's stock pursuant to a stock purchase agreement (the "JUUL Investment"). Altria's investment represented a 35% economic interest in JUUL, valuing the e-cigarette company at $38 billion, with JUUL remaining fully independent. Under the relationship agreement executed in connection with the investment, Altria agreed not to sell or transfer

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

any JUUL shares for six years from December 20, 2018.[1]

4.     The Company's announcement was shocking for numerous reasons.  Altria, and tobacco companies in general, had a long history of advertising to underage individuals and faced legal regulatory repercussions as a result.  Altria claimed to have put its past advertising practices behind it.  JUUL's success, however, was materially the result of targeting youths with its products and engaging in other misleading marketing tactics.  In investing in JUUL, Altria thrust itself right back into the middle of advertising to underage users, something it claimed it was trying to avoid.

5.     Further, as discussed in more detail herein, between December 20, 2018 and February 21, 2020, the Company's fiduciaries made a series of improper statements concerning Altria's JUUL investment in the Company's press releases, filings with the SEC, and during conference calls.  In particular, these fiduciaries claimed the investment would "accelerate JUUL's mission to switch adult smokers to e-vapor products" and thereby generate "long-term benefits for adult smokers and [Altria's] shareholders."  They also endorsed JUUL's products as potentially harm reductive while assuring investors that JUUL is "committed to preventing youth from using any tobacco products[,]" and that "[JUUL's] intent was never to have youth use JUUL products."

6.     Although the public and regulators had raised concerns about e-cigarettes' potential health risks and JUUL's suspected marketing to minors before, this scrutiny intensified almost immediately after Altria finalized its multibillion-dollar investment into JUUL.  Awareness of underage JUUL use grew and reports of seizures and respiratory illness associated with vaping emerged.  As skepticism, negative publicity, and health concerns mounted against JUUL, regulators and government authorities initiated investigations and began restricting sales practices related to e-cigarettes, tarnishing Altria's reputation while diminishing the value of its JUUL Investment.

7.     On April 3, 2019, the U.S. Food and Drug Administration ("FDA") announced it was investigating cases of people suffering seizures following the use of e-cigarettes.  The FDA stated it had received thirty-five reports of such seizures, especially in youth and young adults.  This news sent the

---

[1] Undisclosed at that time was an agreement made in connection with the investment that Altria exit the e-cigarette market.  This decision has led to a lawsuit by the Federal Trade Commission ("FTC") for antitrust violations, along with numerous private lawsuits.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's stock price down by over 4% and erased over $5.07 billion in market capitalization in a single day.

8.      On August 29, 2019, the *Wall Street Journal* reported that the FTC was investigating whether JUUL used marketing practices to appeal to minors.  The next day, the FDA and Centers for Disease Control and Prevention ("CDC") jointly announced they were investigating "the distressing incidents of severe respiratory disease associated with use of e-cigarette products."  Following these announcements, the Company's stock price declined by over 4%, wiping out over $3.9 billion in market capitalization in two days.

9.      On September 12, 2019, *Reuters* reported that, "New Jersey could become the latest state to restrict e-cigarette use."  Also on September 12, 2019, the CDC announced that it had received 380 reported cases of lung diseases associated with vaping, with six total deaths confirmed.  On this news, Altria's stock price fell by 9.76%, or $4.34 per share, to close at $40.12 per share on September 19, 2019, compared to the closing price of $44.46 per share on September 12, 2019, erasing over $8.10 billion in market capitalization in five days.

10.     Then, on September 25, 2019, the Company issued a press release disclosing that Philip Morris International Inc. ("Philip Morris") had called off discussions of a $200 billion merger with Altria. Philip Morris apparently ended discussions of the merger due to scrutiny of the e-cigarette industry and Altria's 35% stake in JUUL.  JUUL also announced that day that its Chief Executive Officer ("CEO") would step down and that it would cease all advertising in the U.S.  This news erased over $597.79 million in Altria's market capitalization in just two days.

11.     On October 31, 2019, the Company disclosed that it recorded a $4.5 billion impairment charge to its JUUL stock holdings, representing over a 35% loss on Altria's JUUL investment in less than one year.  Altria based the JUUL impairment upon several factors, including the increased likelihood of the FDA removing flavored e-vapor products from the market, as well as the various e-vapor bans already in place by cities and states throughout the U.S. and in certain international markets.  On this news, Altria's market capitalization fell by $2.18 billion dollars in a single day.  Then Altria wrote down another $4.1 billion worth of its investment on January 30, 2020, for a total write down of 67%.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12.     In total, the Company lost nearly $50 billion in market capitalization, or $26.35 per share, from its April 2019 high of $57.73 per share to its low of $31.38 per share on March 23, 2020.

13.     Further, as of Altria's most recent Quarterly Report, the Company is now the subject of at twenty-five class actions, 561 individual actions, twenty-four state or local government lawsuits, and eleven lawsuits filed by school districts relating to JUUL e-vapor products, including a number of actions consolidated by the U.S. Judicial Panel on Multidistrict Litigation in the U.S. District Court for the Northern District of California, titled *In re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation* (collectively, the "JUUL Actions").  Many of the JUUL Actions include cases alleging that JUUL's misleading marketing targeted young adults and teenagers while failing to disclose the nicotine in its products, causing addiction.  The JUUL Actions also include personal injury cases relating to pulmonary disease, seizures, as well as other serious health problems.

14.     In addition, as a direct result of the improper statements detailed herein, the Company is now the subject of at least one federal securities class action lawsuit filed in the U.S. District Court for the Eastern District of Virginia on behalf of investors who purchased Altria's stock at artificially inflated prices (the "Securities Class Action").  The Securities Class Action brings claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and generally alleges that Altria and its fiduciaries misrepresented the Company's due diligence into JUUL, as well as the risks associated with JUUL's products and marketing practices.  Altria will likely be subject to more litigation and government investigations going forward.  For example, on February 21, 2020, it was announced that the SEC launched an investigation into Altria's disclosures concerning the risks associated with the JUUL Investment.

**JURISDICTION AND VENUE**

15.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

16.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Altria, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

18.     A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of San Francisco.  A related derivative action is pending in the Oakland division of this Court and therefore, this action is properly assigned to the Oakland division.

## THE PARTIES

**Plaintiff**

19.     Plaintiff Maria Cecilia Lorca has continuously been a shareholder of Altria since December 2014.  Plaintiff is a citizen of Florida.

**Nominal Defendant**

20.     Nominal defendant Altria is a Virginia corporation with principal executive offices located at 6601 West Broad Street, Richmond, Virginia.  Accordingly, Altria is a citizen of Virginia. Altria is a holding company that operates various subsidiaries in the smokeable products, smokeless products, and wine sectors of consumer products.  In December 2018, through a wholly owned subsidiary, Altria acquired a 35% economic interest in JUUL through the purchase of shares of nonvoting convertible common stock.   As of December 31, 2019, Altria and its subsidiaries had approximately 7,300 employees.

**Defendants**

21.     Defendant William F. Gifford, Jr. ("Gifford") is Altria's CEO and has been since April 2020.  Defendant Gifford was also Altria's Chief Financial Officer ("CFO") from March 2015 to April 2020; Vice Chairman from May 2018 to April 2020; Executive Vice President from March 2015 to May 2018; Senior Vice President, Strategy and Business from November 2013 to March 2015; and held various positions of increasing responsibility from 1994 to November 2013.  Defendant Gifford is named

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as a defendant in a related class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Altria paid defendant Gifford the following compensation as an executive:

| Year | Salary | Stock Awards Grant Value | Annual Incentive Plan | Long-Term Incentive Plan | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------------------|----------------------|--------------------------|-------------------------|------------------------|-------|
| 2019 | $871,667 | 2,200,099 | 890,500 | 2,851,200 | $2,456,241 | $104,052 | $9,373,759 |
| 2018 | $820,000 | $5,750,042 | $928,600 | - | $381 | $102,662 | $7,601,685 |

Defendant Gifford is a citizen of Virginia.

22.    Defendant Howard A. Willard III ("Willard") was Altria's CEO, Chairman of the Board of Directors (the "Board"), and a director from May 2018 to April 2020.  Defendant Willard was also Altria's Executive Vice President from January 2011 to May 2018, Chief Operating Officer from March 2015 to May 2018, CFO from January 2011 to February 2015, and held various positions of increasing responsibility with the Company from 1992 to January 2011.  Defendant Willard is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Altria paid defendant Willard the following compensation as an executive:

| Year | Salary | Stock Awards Grant Value | Annual Incentive Plan | Long-Term Incentive Plan | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------------------|----------------------|--------------------------|-------------------------|------------------------|-------|
| 2019 | $1,250,000 | 6,000,091 | - | 3,478,600 | $4,316,446 | $372,479 | $15,417,616 |
| 2018 | $1,113,201 | $6,750,070 | $2,250,000 | - | $1,192,673 | $267,755 | $11,573,699 |

Defendant Willard is a citizen of Virginia.

23.    Defendant Kevin C. Crosthwaite, Jr. ("Crosthwaite") was Altria's Senior Vice President, Chief Strategy and Growth Officer from June 2018 to September 2019; President and CEO, Philip Morris from April 2017 to June 2018; and held various positions of increasing responsibility with the Company from 1997 to April 2017.  Defendant Crosthwaite is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Crosthwaite is a citizen of Virginia.

24.    Defendant JUUL is a Delaware corporation with principal offices located at 560 20th Street, San Francisco, California.  Accordingly, defendant JUUL is a citizen of Delaware and California. Defendant JUUL is an e-cigarette company that sells handheld electronic devices with prefilled, nicotine-containing e-liquid pods.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

25. Defendant Kevin Burns ("Burns") was JUUL's CEO from December 2017 to September 2019 and a director from at least July 2018 to September 2019. Defendants Burns is a citizen of California.

26. Defendant Riaz Valani ("Valani") is a JUUL director and has been since at least May 2011. Defendant Valani is a citizen of California.

27. Defendant Nicholas J. Pritzker ("Pritzker") is a JUUL director and has been since at least April 2015. Defendant Pritzker is a citizen of California.

28. The defendants identified in ¶¶21-23 are referred to herein as the "Altria Individual Defendants." The defendants identified in ¶¶24-27 are referred to herein as the "JUUL Defendants."

## DUTIES OF THE ALTRIA INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

29. By reason of their positions as officers and directors of the Company, each of the Altria Individual Defendants owed and owe Altria and its shareholders fiduciary obligations to act in good faith and are required to use their utmost ability to control and manage Altria in a fair, just, honest, and equitable manner. The Altria Individual Defendants were and are required to act in furtherance of the best interests of Altria and not in furtherance of their personal interest or benefit.

30. In addition, the Company has adopted a Code of Business Conduct and Ethics for Directors (the "Code"). The Code recognizes: "One of our Company's most valuable assets is our reputation for integrity. We should all recognize that our actions are the foundation of our reputation and adhering to this Code and the law is imperative."

31. In addition, in the section concerning "Compliance with Laws, Rules and Regulations," the Code provides:

> The Company is strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations. No director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason when conducting business for the Company.

32. Concerning antitrust laws, the Code provides: "The Company is also fully committed to compliance with all antitrust and competition laws, and will not engage in any improper communications or agreements with competitors."

33.    The Company also has a Code of Conduct that applies to its employees, including senior executives.  Regarding competition laws, the Code of Conduct states that employees should never even discuss with a competitor "[f]ixing terms related to promotions, credit or other terms and conditions of sale" or "[l]imiting production."

34.    Concerning marketing, the Code of Conduct states:

Our companies are committed to responsibly marketing our products to adult consumers. To support this goal, you must:

- Ensure that marketing materials and programs comply with all legal requirements, our Code, policies, practices and commitments

- Hold advertising agencies and product development and marketing consultants to these standards

- Never make misrepresentations about our companies' products, including the health effects of those products

- Substantiate all claims about our companies' products before you make any claims

- Never market our companies' products to underage persons

**Breaches of Duties**

35.    The conduct of the Altria Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Altria, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Altria Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36.    The Altria Individual Defendants breached their duty of good faith by allowing defendants to cause, or by themselves causing, the Company to engage in, the JUUL Investment, which significantly overstated the value of JUUL, the illegal antitrust actions, the illegal false marketing, and the issuance of false and misleading statements, all improper practices that wasted the Company's assets, and caused Altria to incur substantial damage.  The JUUL Defendants knowingly participated and provided assistance in these breaches.

37.    The Altria Individual Defendants, because of their positions of control and authority as officers and/or directors of Altria, were able to and did, directly or indirectly, exercise control over the

wrongful acts complained of herein.  The Altria Individual Defendants also failed to prevent the other Altria Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Altria has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Altria Individual Defendants and JUUL Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Altria Individual Defendants and JUUL Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Altria Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Altria, regarding the Altria Individual Defendants' management of Altria's operations; (ii) permit or approve the illegal business practices described herein, including violations of antitrust and marketing laws; and (iii) enhance the Altria Individual Defendants' executive and directorial positions at Altria and the profits, power, and prestige that the Altria Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Altria Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Altria Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly violate the law as detailed herein.  Because the actions described herein occurred under the authority of the Board, each of the Altria Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Altria Individual Defendants and JUUL Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

### THE COMPANY'S DISASTROUS JUUL INVESTMENT

**JUUL Enters the Market Through Advertising Directed at Minors**

42.     According to the CDC, e-cigarettes are devices that produce an aerosol by heating a liquid that usually contains nicotine, flavorings, and other chemicals that a user then inhales into their lungs.  E-cigarettes are known by many different names.  They are sometimes called "e-cigs," "e-hookahs," "mods," "vape pens," "vapes," "tank systems," and "electronic nicotine delivery systems (ENDS)."

43.     JUUL entered the market in 2015.  Its products were designed for, and aimed its marketing towards, minors and young adults.  With a device resembling a flash-drive and nicotine cartridge flavors that cigarette companies are prohibited from marketing precisely because the flavors appeal to minors, it was obvious that JUUL's stated mission of "switching adult smokers" to JUUL devices was false.  Instead, JUUL's unspoken goal was to achieve growth through repeated sales of an addictive and harmful product to minors as well as young adults.  This aggressive advertising strategy worked.  According to the FTC's complaint, by 2018, JUUL dominated the market, controlling approximately 70% of it.

44.     Reports of JUUL's successful marketing to minors emerged long before Altria signed and closed its investment in JUUL.  For example, on December 4, 2017, *National Public Radio* detailed JUUL's widespread popularity among teens and young adults, titled "Teenagers Embrace JUUL, Saying It's Discreet Enough to Vape in Class."  The article quotes an eighteen year old student who stated that as much as 60% of her friends have a JUUL.  The article also links the spike in youth use to JUUL's design and flavors, stating: "The JUUL device, with its sleek design that resembles a flash drive, is a special hit with teens. …  The JUUL also has multiple flavors available – mint, tobacco, mango, crème brulee and fruit."  In November 2018, the CDC reported that current e-cigarette use among American high school students reached 20.8%, representing a 78% increase from the prior year.  Altria's fiduciaries should have known JUUL was responsible for this increase in light of JUUL's admitted rapid growth, impressive market share, and leadership in the e-vapor category.

45.     Even without these public reports, Altria's fiduciaries would have recognized that JUUL was targeting youth by simply looking at its advertising.  On January 31, 2019, Stanford University School of Medicine published an article conducted by a team of researchers titled "JUUL Advertising over Its First Three Years on the Market."  The researchers concluded that JUUL's advertising imagery was "**_patently youth oriented_**" in its first six months on the market, noting that even though JUUL's advertising was "more muted" for the next two and a half years, it "was widely distributed on social media channels frequented by youth … and catalyzed by compensated influencers and affiliates."  The article provided JUUL's initial 2015 campaign as an example of "imagery [that] resonated with underage teens who aspire to emulate … trendsetting young adults," the "net effect [of which] was to establish a notably youth-oriented brand identity for JUUL."  In particular, the ad shows:



46.     The imagery in the ad above and others like it directly contradicts JUUL's claim that it never intended "to have youth use JUUL products," a claim that the Company's fiduciaries reiterated when they announced the JUUL Investment.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

47.     The above advertising also demonstrates that if the Altria Individual Defendants had looked into JUUL's advertising and marketing practices, even in a cursory manner, they would have known that JUUL was targeting youths.  Sufficient due diligence also would have revealed that JUUL's market share was largely comprised of youths, not adults.

**JUUL Faced Liability and Regulatory Risks at the Time of Altria's Investment**

48.     As fiduciaries of a tobacco company, Altria's officers and directors were well aware that successfully targeting minors to use nicotine products presented tangible liability risks and that regulators would take action to hamstring these practices, thereby stalling JUUL's business while reducing its value.

49.     Under the Tobacco Master Settlement Agreement and the Smokeless Tobacco Master Settlement Agreement reached in 1998, participating manufactures, including Altria, agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State."

50.     In 2009, the FDA banned flavored cigarettes pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009.  Then FDA commissioner, Dr. Margaret A. Hamburg, announced the ban because "flavored cigarettes are a gateway for many children and young adults to become regular smokers."  Although e-cigarettes escaped the ban because they did not exist yet, the regulation should have alerted Altria's fiduciaries that the FDA would take action against flavored nicotine products, and that the loophole would inevitably close on JUUL.

51.     The FDA was publicly targeting JUUL months before Altria's investment.  First, on April 23, 2018, FDA Commissioner Scott Gottlieb ("Gottlieb") issued a statement on "new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes." The agency announced it was taking "new action to examine youth appeal of JUUL" and initiating steps "to foreclose online sales of JUUL to minors."  Gottlieb also announced that it had sent a letter to JUUL "requiring the company to submit important documents to better understand the reportedly high rates of youth use and the particular youth appeal of these products."  Specifically, the announcement stated:

> Today, we're announcing several new actions and efforts aimed at doing just that as the first steps in a new Youth Tobacco Prevention Plan focused on stopping youth use of tobacco products, and in particular, e-cigarettes.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The troubling reality is that electronic nicotine delivery systems (ENDS) such as e-cigarettes have become wildly popular with kids. We understand, by all accounts, many of them may be using products that closely resemble a USB flash drive, have high levels of nicotine and emissions that are hard to see. These characteristics may facilitate youth use, by making the products more attractive to children and teens.

These products are also more difficult for parents and teachers to recognize or detect. Several of these products fall under the JUUL brand, but other brands, such as myblu and KandyPens, that have similar characteristics are emerging. In some cases, our kids are trying these products and liking them without even knowing they contain nicotine. And that's a problem, because as we know the nicotine in these products can rewire an adolescent's brain, leading to years of addiction. For this reason, the FDA must – and will – move quickly to reverse these disturbing trends, and, in particular, address the surging youth uptake of JUUL and other products.

*        *        *

[T]oday, the FDA also sent an official request for information directly to JUUL Labs, requiring the company to submit important documents to better understand the reportedly high rates of youth use and the particular youth appeal of these products. The information we're requesting includes: documents related to product marketing; research on the health, toxicological, behavioral or physiologic effects of the products, including youth initiation and use; whether certain product design features, ingredients or specifications appeal to different age groups; and youth-related adverse events and consumer complaints associated with the products. We don't yet fully understand why these products are so popular among youth. But it's imperative that we figure it out, and fast. These documents may help us get there.

We plan to issue additional letters to other manufacturers of products that raise similar concerns about youth use. If these companies, including JUUL, don't comply with our requests, they will be in violation of the law and subject to enforcement.

52.     Then, on September 18, 2018, the FDA issued a press release announcing its launch of a "new, comprehensive campaign to warn kids about the dangers of e-cigarette use as part of [the] agency's Youth Tobacco Prevention Plan, amid evidence of sharply rising use among kids."  The agency designated youth e-cigarette use as an "epidemic."  Gottlieb stated in the release that the FDA's evidence of this "dangerous trend" strongly suggests "the presence of flavors is one component making these products especially attractive to kids."  He further stated: "The mandate to reverse this trend in youth addiction to nicotine is one of my highest priorities.  I'm employing every tool at my disposal in these efforts."

53.     The FDA was not alone in publicly investigating JUUL or taking other steps to curb the use of flavored e-liquids.  For instance, in June 2018, San Francisco banned the use of flavored liquids for e-cigarettes.  Then, on July 24, 2018, the Massachusetts Attorney General announced an investigation

- 13 -

into JUUL's marketing and sale of minors.  The Massachusetts Attorney General's announcement called out JUUL and others in the e-cigarette industry's use of flavored products that appeal to minors.

54.     The Altria Individual Defendants thus knew there was a significant likelihood of the FDA and other governmental agencies would act against JUUL, including banning flavored e-cigarette products months before finalizing Altria's JUUL Investment.  They also knew that regulatory pressure to ban e-cigarette flavors would devastate JUUL's value, given that the majority of the company's sales were its flavored products.  In fact, during the Company's earning conference call on July 26, 2018, defendant Willard was specifically asked about San Francisco's ban and the Massachusetts' Attorney General's actions.  Defendant Willard downplayed the ban and stated the Company's insiders were "not surprised" by the Attorney General's actions, and in fact "appreciated" it.  In particular, the following exchange occurred:

> [Analyst]:  Great. And then look, I guess, just stepping back, as you said in the opening remarks, there's been a ton of development this quarter from a regulatory perspective. But I actually wanted to ask your opinion about 2 things that have happened more at the local level versus the federal level in the quarter. First is just the flavors ban in San Francisco that was passed in June and the second, which, I guess, is outside the quarter, but the recent Attorney General investigation in Massachusetts into JUUL. I'd just love your thoughts on both as the potential precedents. And on the latter, just to be clear, I don't expect you to comment on the competitor situation specifically, but I am interested in your views as to what implications such an action might have indirectly on the e-vapor category broadly or even on your MarkTen business specifically.
>
> [Defendant Willard]: Sure. I'll start with the San Francisco flavor ban. What we have found is that there is some low level of activity in various localities and occasionally, a city, that is at odds with the general trend at the federal and state level. And that's really how I would frame that San Francisco flavor ban. I think it's more of an aberration than it is the beginning of a trend. But it would not surprise me if you had a handful of other localities or cities that are particularly anti-tobacco take up that activity. But I wouldn't expect it to get much traction on a larger scale.
>
> [Analyst]:  Great. That's helpful. And then as to what the Attorney General is doing or may do in Massachusetts as it relates to e-vapor.
>
> [Defendant Willard]:  Sure. I think what we're seeing is that for quite some time, the tobacco industry has been expected to operate under a very specific set of rules, and the Master Settlement Agreement laid those out for the cigarette category. But frankly, we've -- as we've expanded into other categories, we've always had a significant focus on making sure that we market only to adult tobacco consumers and that we minimize unintended reach of our marketing to folks that are nonsmokers. And we are always aware that the FDA and the Attorneys General are watching everything we do to make sure we're

operating responsibly. And I think that -- we think that has resulted in a category where the level of marketing that is seen by nontobacco users has come down dramatically. And of course, youth smoking rates are at all-time lows. I think that, that is the way any responsible tobacco company needs to operate in the U.S., and I think that the AGs who monitor marketing activity and all other tobacco activity across the country, I think, don't hesitate to reach out to tobacco manufacturers if they think they're not operating against the basic rules of the industry. And so I can't specifically comment on the details of the action in Massachusetts, but I think as an experienced player in the category, we're not surprised. And frankly, we appreciate the AGs making sure that there's a minimum level of performance expected from everybody in the industry.

55.     According to Gottlieb, the FDA requested that Altria and the other tobacco companies submit "voluntary plans for how they proposed to address [the youth vaping] crisis," in mid- to late-2018. In response, Altria stated:

[It] felt that the youth addiction crisis was being driven by the pod-based systems in particular and especially the flavored products. And [Altria] said – [Altria] agreed to withdraw [its] pod-based products from the market at that time voluntarily and said that [it] wouldn't put flavored products on the market other than menthol in tobacco until they either have an authorized PMTA [premarket tobacco product application] by the FDA or otherwise have evidence that the youth addiction crisis has abated.

56.     On November 7, 2019, amid regulatory pressure, JUUL announced it would halt sales of its mint flavor, which represent 70% of JUUL's sales in the U.S.  JUUL stopped selling its other popular fruit and dessert flavors in retail stores in 2018 and online in October 2019.

57.     Thus, Altria knew that JUUL's products, which hinged on pod-based flavored e-liquid, was driving a youth vaping crisis.  It also knew that regulators were preparing to take action against JUUL and others in the e-cigarette industry.  In addition to these regulatory risks, the Altria Individual Defendants should have been aware that the negative publicity surrounding JUUL in the months before the investment had also reduced JUUL's value.  They also should have known that lawsuits would inevitably be filed against JUUL, with litigation expenses and liability potentially attaching to Altria.

58.     The Altria Individual Defendants ignored the above risks and led Altria to take on a 35% ownership in JUUL even though it was not in its best interest to do so.  These defendants also caused Altria to pay $12.8 billion for that ownership when adequate due diligence would have revealed that JUUL was overvalued.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Altria Enters into the JUUL Investment Despite These Known Risks**

59.    Altria and JUUL began to have "confidential discussions" when the Company, led by defendant Willard, contacted JUUL about a commercial relationship in early 2017.  The negotiations, however, did not begin in earnest until 2018.

60.    In particular, on July 30, 2018, defendant Pritzker e-mailed defendant Willard an opening term sheet.  Defendants Pritzker and Valani, two members of JUUL's board of directors, and defendant Burns, JUUL's CEO, met with defendants Willard and Gifford on August 1, 2018.

61.    JUUL and Altria continued to negotiate over the next few weeks.  At one point, defendant Valani met with Dinyar S. Devitre, an Altria Board member.  Mr. Devitre's direct involvement in negotiations demonstrates that the Board was closely tracking JUUL and the negotiations of the JUUL Investment.

62.    Negotiations appeared stalled over JUUL's demand that Altria exit the e-cigarette market completely.  However, after defendant Willard informed JUUL defendants Pritzker, Valani, and Burns that the Company was willing to exit this market, negotiations heated up again.

63.    Finally, on December 20, 2018, Altria announced it entered into the investment agreement with JUUL.  Altria agreed to pay JUUL $12.8 billion and provide it with support in exchange for nonvoting equity, which could change into voting shares based on certain events occurring.  In order to afford the deal, Altria had to double its debt.  Despite the substantial investment, Altria never presented the JUUL Investment to shareholders for approval.

**The Defendants' Actions also Violated Antitrust Laws**

64.    Before the JUUL Investment, Altria introduced its own e-cigarette business.  In the mid-2010s, it recognized that it needed to look into new alternative nicotine products and e-cigarettes was the fastest growing category.  The Company introduced the MarkTen e-cigarette in 2013 and spent over $100 million acquiring other e-cigarette companies.

65.    In February 2018, the Company introduced that MarkTen Elites, a pod-based e-cigarette that closely resembled JUUL's products.  While Altria's e-cigarette market presence remained small, the MarkTen Elite was a significant threat due to Altria's pre-established relationships and size.  JUUL, therefore, demanded that Altria exit the e-cigarette market as a condition to any agreement.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

66.    Altria acceded in this demand.  The Company pulled the MarkTen Elite from the market in October 2018.  The Company's stated reasoning was that it was concerned that pod-based systems and nontraditional flavors could be contributing to youth usage.  While correct, this concern rings hollow in light of pod-based systems and nontraditional flavors being the hallmarks of JUUL's products.  It does, however, show that the Altria Individual Defendants' statements that JUUL's products were not marketed towards youths were knowingly false, as described in more detail herein.

67.    Then, on December 7, 2018, shortly before announcing the JUUL Investment, Altria wound down the rest of its e-cigarette business.

68.    The JUUL Investment contained terms that solidified JUUL's dominance in the market. In particular, Altria and JUUL entered into a "Relationship Agreement," which contained a noncompete provision (the "Noncompete") restricting Altria from competing in the relevant market; a Services Agreement, whereby Altria agreed to provide a variety of support services for JUUL; an Intellectual Property License Agreement licensing Altria's e-cigarette intellectual property to JUUL; and a Voting Agreement providing Altria representation on JUUL's board of directors following the conversion of its shares.

69.    In February 2019, the Company filed for Hart-Scott-Rodino Act clearance in order to convert its interests into voting securities and exercise its right to appoint three (of nine) members to JUUL's board of directors.  This request caused the FTC to review the terms of the JUUL Investment, including the Relationship Agreement, the Noncompete, and Altria removing its competing product from the market.  The chance for collusion was further heightened by Altria having an "observer" on JUUL's board of directors.  This observer seat allowed the Company to have access to JUUL's nonpublic information and adjust its plans according.

70.    In January 2020, Altria and JUUL entered into revised agreements concerning the JUUL Investment.  The revised agreements contained many of the same troubling aspects of the initial agreement.  In particular, under the revised Voting Agreement, Altria would have the right to: (i) appoint two (of nine) JUUL directors; (ii) nominate one (of three) JUUL independent directors; (iii) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (iv) appoint two (of five) members and the Chair of a new Litigation Oversight Committee

(which would have responsibility for managing litigation involving both Altria and JUUL, i.e., "Joint Litigation Matters"); and (v) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change JUUL's senior outside counsel responsible for Joint Litigation Matters).

71.     The amendment to the Relationship Agreement gives Altria the option to be released from the Noncompete if JUUL is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

72.     On April 1, 2020, the FTC filed an administrative complaint against Altria and JUUL over the Company's decision to exit the e-cigarette market and enter into the agreements related to the JUUL Investment.  The FTC is seeking to unwind the JUUL Investment.

## IMPROPER STATEMENTS

73.     On December 20, 2018, Altria issued a press release and filed a Current Report on Form 8-K with the SEC announcing that it had signed and closed a $12.8 billion investment in JUUL, the purported "U.S. leader in e-vapor."  As pointed out in the press release, Altria's investment of $12.8 billion for a 35% economic interest in JUUL valued that "company at $38 billion."  The press release emphasized that the JUUL investment would "drive growth."  It also claimed the Services Agreement related to the investment would "accelerate JUUL's mission to switch adult smokers to e-vapor products," thus resulting in increased JUUL sales and added value to the Company's investment.  In particular, the press release stated:

**ALTRIA MAKES $12.8 BILLION MINORITY INVESTMENT IN JUUL TO ACCELERATE HARM REDUCTION AND DRIVE GROWTH**

***Altria and JUUL sign service agreements to accelerate JUUL's success switching adult smokers; JUUL has the unique opportunity to reach adult smokers through prime retail shelf space, inserts in cigarette packs and adult smoker database***

***JUUL will remain fully independent***

RICHMOND, Va.—December 20, 2018—Altria Group, Inc. (Altria) (NYSE: MO) today announces it signed and closed a $12.8 billion investment in JUUL Labs, Inc. (JUUL), the U.S. leader in e-vapor. The service agreements will accelerate JUUL's mission to switch adult smokers to e-vapor products. Altria's investment represents a 35% economic interest in JUUL, valuing the company at $38 billion. JUUL will remain fully independent.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Altria's CEO and Chairman, defendant Willard, commented in the press release, further endorsing the benefits that the JUUL Investment would bring to Altria and its shareholders.  Specifically, Willard highlighted JUUL's "world leader[ship] in switching adult smokers" to products that "reduce harm," claiming that "working with JUUL … will have long-term benefits for adult smokers and [Altria's] shareholders."  In particular, the press release stated:

> "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, *a world leader in switching adult smokers*," said Howard Willard, Altria's Chairman and Chief Executive Officer. "We have long said that providing adult smokers with superior, satisfying products with the potential to *reduce harm* is the best way to achieve *tobacco harm reduction*. Through JUUL, we are making the biggest investment in our history toward that goal. *We strongly believe that working with JUUL to accelerate its mission will have long-term benefits for adult smokers and our shareholders*."

74.     The press release also quoted JUUL's CEO, defendant Burns, who echoed defendant Willard's assurances that JUUL's products reduce harm, claiming that JUUL's technology "improve[s] the lives of the world's one billion adult cigarette smokers."  Specifically, the press release stated:

> "Altria's investment sends a very clear message that JUUL's technology has given us a truly *historic opportunity to improve the lives of the world's one billion adult cigarette smokers*," said Kevin Burns, Chief Executive Officer of JUUL. "This investment and the service agreements will accelerate our mission to increase the number of adult smokers who switch from combustible cigarettes to JUUL devices."

75.     In further promoting Altria's JUUL investment, the press release touted JUUL's fast growth and impressive market share.  Defendant Willard added it was "a unique and compelling opportunity to invest in an extraordinary company" and that Altria would "build on [JUUL's] tremendous success."  In particular, the press release stated:

> An Extraordinary E-vapor Company with a Strong Product Pipeline
>
> Fueled by its unique and innovative Silicon Valley approach to product development and founded by former smokers, JUUL has rapidly built an industry-leading position by satisfying adult tobacco consumers with its differentiated e-vapor products.
>
> JUUL has quickly grown both revenue and share, and today represents approximately 30% of the total U.S. e-vapor category.1 JUUL has a deep innovation pipeline and currently operates in eight countries, with rapid international expansion plans.
>
> "This is a unique and *compelling opportunity to invest in an extraordinary company, the fastest growing in the U.S. e-vapor category*. We are excited to support JUUL's highly-

talented team and offer our best-in-class services to build on their **tremendous success**," added Willard.

76.    Finally, the press release assured investors that JUUL, like Altria, was "[c]ommit[ed] to [u]nderage [t]obacco [p]revention."  It supported this claim by listing a number of JUUL's recent actions designed to prevent underage vaping and promised that Altria and JUUL would work together to prevent underage usage.  In particular, the press release stated:

Commitment to Underage Tobacco Prevention

***Altria and JUUL are committed to preventing youth from using any tobacco products***.
As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. As JUUL previously said, "Our intent was never to have youth use JUUL products. But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem."

As a result, JUUL recently began implementing a number of actions to prevent underage vaping, including stopping the sales of flavored products to retail stores, enhancing age-verification for its online sales, eliminating social media accounts and developing further technology solutions.

JUUL believes that it cannot fulfill its mission to provide the world's one billion adult smokers with a true alternative to combustible cigarettes if youth use continues unabated. Together, JUUL and Altria will work to prevent youth usage through their announced initiatives, further technological developments and increased advocacy for raising the minimum age of purchase for all tobacco products to 21.

77.    During the ensuing analyst conference call that day, defendant Willard claimed that, "[i]mportantly, Altria and JUUL are committed to preventing kids from using any tobacco products.  As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve."  In response to an analyst question, defendant Willard claimed that the use of underage JUUL was "quite a small percentage."  In particular, the following exchange occurred:

[Analyst]: Howard, so how much of JUUL's business over the last 12 months have you concluded comes from underage consumers? And how confident are you that progress can be made to eradicate that consumption? And I guess, lastly, what is the risk that you assigned to the idea that JUUL's products ultimately may not receive FDA approval through the PMTA process, given their known association with underage consumption?

[Defendant Willard]: Yes. I think it's hard to nail down exactly how much of the volume could be contributed to -- could be attributed to underage use. We believe it's quite a small percentage[.]

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

78.     JUUL also issued a press release on December 20, 2018 discussing the deal, titled "JUUL Statement About Altria Minority Investment and Service Agreements."  The press release falsely claimed that JUUL's "intent was never to have youth use JUUL products."

79.     On February 20, 2019, defendant Willard and other members of Altria's senior management presented at the 2019 Consumer Analyst Group of New York (CAGNY) Conference. During the conference, defendant Willard lauded JUUL's success while emphasizing that it was positioned for "long-term leadership and growth both in the U.S. and internationally."  Defendant Willard also assured investors that the Altria Individual Defendants conducted "in-depth due diligence." Specifically, defendant Willard stated:

> *We've followed JUUL's journey rather closely*. Two years ago, JUUL grew rapidly but in a small number of retail stores. Other e-vapor products had achieved periods of brief category leadership often driven by introductory offers, so *we watched JUUL carefully to see if it had staying power*. We knew JUUL had a unique product, but it wasn't clear whether the product and the brand had the ability to establish long-term leadership and brand equity. During 2018, we concluded that JUUL had not only become the retail share leader in the U.S. e-vapor category, but that no other brand was close to it in share or future growth potential.  In addition, it was not until we conducted in-depth due diligence in the fourth quarter of 2018 that we fully grasped the many other strengths and capabilities that we believe position JUUL for long-term leadership and growth both in the U.S. and internationally. For example, we saw that their product pipeline was significantly more developed, and that their manufacturing capabilities and international plans were more robust than we believed. We then became convinced that JUUL was far more than another temporary leader and that they'd built a platform for long-term success in e-vapor.
>
> As a consumer products company, we firmly believe that brands matter, and JUUL is demonstrating strong loyalty and brand equity. In our consumer research, nearly 50% of adult tobacco consumers who've tried JUUL say it was the first e-vapor brand they used consistently. JUUL's net promoter score, a proxy for gauging overall satisfaction and loyalty, measured a remarkable +57, a score that compares favorably to a wide range of global brands across diverse industries.  Throughout our analysis, it became clear that investing with JUUL to accelerate its global growth was more value accretive than investing internally to leap frog its product. We determined that our services and infrastructure could complement JUUL's terrific product and capabilities, and help advance a *compelling long-term commercial and harm-reduction opportunity*.

80.     On February 26, 2019, the Company filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2018 (the "2018 Form 10-K").  Defendants Willard and Gifford signed the 2018 Form 10-K.  In addition, the 2018 Form 10-K contained signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX") by defendants Willard and Gifford attesting that the report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

81. In the 2018 Form 10-K, these defendants downplayed the fact that regulatory concern with underage e-vapor use threatened the value of Altria's JUUL investment. Specifically, although the 2018 Form 10-K disclosed that Altria received a letter from the FDA "expressing concern about this investment given the rise in underage use of e-vapor products," these fiduciaries assured investors that the Company responded by reaffirming its ongoing commitment to preventing underage use. The 2018 Form 10-K further assured investors that Altria would continue discussions regarding underage e-vapor use with the FDA going forward. In particular, the 2018 Form 10-K stated:

> *Underage Access and Use of E-vapor Products*: The FDA announced in September 2018 that it is using its regulatory authority to address underage access and use of e-vapor products. As part of this effort, the FDA issued letters to manufacturers of certain e-vapor products, including Nu Mark and JUUL, requiring them to (1) discuss with the FDA the steps each manufacturer intends to take to address youth access and use of its e-vapor products and (2) within 60 days provide a detailed written plan to address underage access and use.
>
> In October 2018, Altria responded to the FDA's request for a written plan setting forth the actions it was taking to address underage access and met with the FDA. In December 2018, Altria refocused its innovative product efforts, which included the discontinuation of all Nu Mark e-vapor products. Altria's decision was based on current and expected financial performance of its innovative products, as well as regulatory restrictions limiting the ability to quickly improve such products. Later in December, Altria purchased, through a wholly owned subsidiary, a 35% economic interest in JUUL. Following the announcement of this investment, Altria requested a meeting with the FDA to discuss the transaction and its ongoing support for underage tobacco prevention. In February 2018, the FDA sent Altria a letter expressing concern about this investment given the rise in underage use of e-vapor products and issued a statement indicating that, if the increased trend in underage use of e-vapor products does not reverse, the FDA may unilaterally take action to address the trend. Altria responded by reaffirming its ongoing and long-standing investment in underage tobacco prevention efforts. For example, Altria is advocating raising the minimum legal age to purchase all tobacco products to 21 at the federal and state levels to further address underage tobacco use. Altria will meet with the FDA to continue discussing underage e-vapor use.

82. In addition, rather than specifically warn investors that the transpiring regulatory action—including the recently received letter from the FDA—posed a tangible risk to the expected benefits of the JUUL Investment, the 2018 Form 10-K merely provided a generic catch-all provisions on that point. Specifically, the 2018 Form 10-K stated:

[T]he expected benefits of the JUUL transaction, such as any equity earnings and receipt of cash dividends, may not materialize in the expected manner or timeframe or at all, including due to the risks encountered by JUUL in its business, such as operational risks and regulatory risks at the international, federal and state levels, including actions by the FDA; unanticipated impacts on JUUL's relationships with employees, customers, suppliers and other third parties; potential disruptions to JUUL's management or current or future plans and operations due to the JUUL transaction; or domestic or international litigation developments, investigations, or otherwise. … Failure to realize the expected benefits of our JUUL investment could adversely affect the value of the investment. As discussed in the *Discussion and Analysis - Critical Accounting Policies and Estimates* in Item 7, if a qualitative assessment of impairment of our JUUL investment were to indicate that its fair value is less than its carrying value, the investment would be written down to its fair value, which could have a material adverse effect on Altria's consolidated financial position or earnings.

## THE TRUTH SLOWLY EMERGES AS THE IMPROPER STATEMENTS CONTINUE

83.     On April 3, 2019, the FDA issued a press release announcing its investigation into reports of seizures following the use of e-cigarettes, "especially [in] youth and young adults." The FDA stated that since 2010, it had received "a total of 35 reported cases of seizures following use of e-cigarettes."

84.     Following the FDA's announcement, Altria's market capitalization dropped by over 4%, or $2.71 per share on April 3, 2019, to close at $53.98 per share compared to the previous day's closing of $56.69 per share, erasing $5.07 billion in market capitalization in a single day.

85.     Despite this announcement, the Company's fiduciaries continued to highlight the purported benefits of Altria's investment in JUUL. On April 25, 2019, Altria issued a press release announcing its financial results for the first quarter of 2019. In the press release, defendant Willard emphasized that Altria's "new strategic investments," which included the JUUL investment, were factors that would accelerate the Company's growth and "long-term success." In particular, the press release stated:

"After taking steps to position Altria for long-term success at the end of 2018, we entered 2019 with an evolved business platform that includes our strong core tobacco businesses and new strategic investments with tremendous potential for growth," said Howard Willard, Altria's Chairman and Chief Executive Officer. "We believe we've made significant progress in the first quarter on key initiatives to realize the potential of our evolved business platform."

86.     Also on April 25, 2019, Altria filed its Quarterly Report on Form 10-Q for the period ended March 31, 2019 (the "Q1 2019 Form 10-Q") with the SEC. Despite the mounting negative publicity and regulatory scrutiny against JUUL, the Q1 2019 Form 10-Q provided an undetailed

discussion of ongoing e-vapor litigation against Altria while assuring investors that the Company was already preparing responses to these lawsuits.  In particular, the Q1 2019 Form 10-Q stated:

> *E-vapor Litigation*
>
> In April 2019, Altria, PM USA and JUUL were named as defendants in a tobacco and health class action lawsuit filed in the United States District Court for the Middle District of Florida. The lawsuit involves JUUL e-vapor products and proposes various classes of plaintiffs. The theories of recovery include: violation of RICO; fraud; failure to warn; design defect; negligence; unjust enrichment and deceptive and unfair trade practices. Plaintiffs seek various forms of relief including compensatory and punitive damages. Altria and PM USA are preparing their responses to the lawsuit.

87.     The Q1 2019 Form 10-Q also contained substantively the same representation in the 2018 Form 10-K regarding the letter that Altria received from the FDA following its investment in JUUL, again reassuring investors that the Company responded by "reaffirming its ongoing and long-standing investment in underage tobacco prevention efforts."  In particular, the Q1 2019 Form 10-Q stated:

> *Underage Access and Use of E-vapor Products*
>
> The FDA announced in September 2018 that it is using its regulatory authority to address underage access and use of e-vapor products. As part of this effort, the FDA issued letters to manufacturers of certain e-vapor products, including Nu Mark and JUUL, requiring them to (1) discuss with the FDA the steps each manufacturer intends to take to address youth access and use of its e-vapor products and (2) within 60 days provide a detailed written plan to address underage access and use.
>
> In October 2018, Altria responded to the FDA's request for a written plan setting forth the actions it was taking to address underage access and met with the FDA. In December 2018, Altria refocused its innovative product efforts, which included the discontinuation of all Nu Mark e-vapor products. Altria's decision was based on current and expected financial performance of its innovative products, as well as regulatory restrictions limiting the ability to quickly improve such products. Later in December, Altria purchased, through a wholly owned subsidiary, a 35% economic interest in JUUL. Following the announcement of this investment, Altria requested a meeting with the FDA to discuss the transaction and its ongoing support for underage tobacco prevention. In February 2019, the FDA sent Altria a letter expressing concern about this investment given the rise in underage use of e-vapor products and issued a statement indicating that, if the increased trend in underage use of e-vapor products does not reverse, the FDA may unilaterally take action to address the trend. Altria responded by reaffirming its ongoing and long-standing investment in underage tobacco prevention efforts. For example, Altria is advocating raising the minimum legal age to purchase all tobacco products to 21 at the federal and state levels to further address underage tobacco use.

88.    The Q1 2019 Form 10-Q contained signed certifications pursuant to SOX by defendants Willard and Gifford attesting that the report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

89.    On May 16, 2019, Altria held its annual shareholder meeting.  During the meeting, defendant Willard claimed that the Company was aware of the litigation against JUUL when Altria decided to invest and that Altria was committed to reducing youth e-cigarette use.

90.    On July 30, 2019, Altria issued a press release announcing its financial results for the second quarter of 2019.  In the press release, defendant Willard tout the JUUL Investment as a factor that would contribute to the Company's success during a "dynamic time." In particular, the press release stated:

> "Altria delivered excellent second quarter adjusted diluted earnings per share growth of nearly 9%, driven by our core tobacco businesses," said [defendant Willard]. "We've maintained our focus on the adult tobacco consumer and believe that with our leading premium tobacco brands, U.S. commercialization rights to IQOS, investment in JUUL and pending transaction for *on!*, we are best positioned among tobacco peers to lead through a dynamic time in the U.S."

91.    Also on July 30, 2019, Altria filed its Quarterly Report on Form 10-Q for the period ended June 30, 2019 (the "Q2 2019 Form 10-Q") with the SEC.  The Q2 2019 Form 10-Q also contained substantively the same representation in the 2018 Form 10-K regarding the letter that Altria received from the FDA following its investment in JUUL, again reassuring investors that the Company responded by "reaffirming its ongoing and long-standing investment in underage tobacco use prevention efforts." In particular, the Q2 2019 Form 10-Q stated:

> *Underage Access and Use of Certain Tobacco Products*
>
> The FDA announced in September 2018 that it is using its regulatory authority to address underage access and use of e-vapor products. As part of this effort, the FDA issued letters to manufacturers of certain e-vapor products, including Nu Mark and JUUL, requiring them to (1) discuss with the FDA the steps each manufacturer intends to take to address youth access and use of its e-vapor products and (2) within 60 days provide a detailed written plan to address underage access and use.
>
> In October 2018, Altria responded to the FDA's request for a written plan setting forth the actions it was taking to address underage access and met with the FDA. In December 2018, Altria refocused its innovative product efforts, which included the discontinuation of all Nu Mark e-vapor products. Altria's decision was based on current and expected financial performance of its innovative products, as well as regulatory restrictions limiting the ability to quickly improve such products. Later in December, Altria purchased, through a wholly

- 25 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

owned subsidiary, a 35% economic interest in JUUL. Following the announcement of this investment, Altria requested a meeting with the FDA to discuss the transaction and its ongoing support for underage tobacco use prevention. In February 2019, the FDA sent Altria a letter expressing concern about this investment given the rise in underage use of e-vapor products and issued a statement indicating that, if the increased trend in underage use of e-vapor products does not reverse, the FDA may unilaterally take action to address the trend. Altria responded by reaffirming its ongoing and long-standing investment in underage tobacco use prevention efforts. For example, Altria is advocating raising the minimum legal age to purchase all tobacco products to 21 at the federal and state levels to further address underage tobacco use.

92.    The Q2 2019 Form 10-Q contained signed certification pursuant to SOX by defendants Willard and Gifford attesting that the report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

93.    On August 29, 2019, the *Wall Street Journal* published an article titled "Juul's Marketing Practices Under Investigation by FTC."  The article reported that the FTC "is investigating whether [JUUL] used influencers and other marketing to appeal to minors … ratcheting up pressure on a company whose products are blamed for a rise in vaping among teens."  The article further warned that "[t]he regulatory risks surrounding Juul" have complicated Philip Morris' merger discussions with Altria.  In particular, the article provides:

The Federal Trade Commission is investigating whether e-cigarette startup Juul Labs Inc. used influencers and other marketing to appeal to minors, according to people familiar with the matter, ratcheting up pressure on a company whose products are blamed for a rise in vaping among teens.

The probe, which hasn't previously been disclosed, began before the agency's antitrust review of a December deal in which tobacco giant Altria Group Inc. invested $12.8 billion to take a 35% stake in Juul, those and other people familiar with the matter said. The FTC is also determining whether to seek monetary damages, one of the people said.

*        *        *

The regulatory risks surrounding Juul have taken on new weight for Altria as the Marlboro maker engages in advanced talks to merge with Philip Morris International Inc. Altria sells Marlboros in the U.S.; Philip Morris sells them everywhere else. Their merger discussions were motivated in part by the risks and opportunities that Juul presents as the startup expands into overseas markets and woos cigarette smokers away from both tobacco companies, according to people familiar with the matter.

94.    The following day, on August 30, 2019, the FDA and CDC issued a joint statement announcing that both agencies are "working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products."  The agencies went on to report that they

"were deeply saddened last week to learn of the death of an adult in Illinois who had been hospitalized with a severe respiratory illness following the use of an e-cigarette product."  They further revealed that, as of August 27, 2019, 215 possible cases of respiratory illness associated with e-cigarette use had been reported, and that "additional reports of pulmonary illness are under investigation."

95.    From August 28, 2019 to August 30, 2019, Altria's stock price fell 4.6%, representing a market capitalization drop of nearly $4 billion.

96.    On September 12, 2019, *Reuters* published an article titled "New Jersey expected to announce vaping restrictions within weeks."  The article reported that New Jersey could soon "become the latest state to restrict e-cigarette use, with the governor on Thursday launching a task force to find ways to curb vaping, linked by U.S. health officials to hundreds of respiratory illnesses and a half-dozen deaths."

97.    Also on September 12, 2019, the CDC reported that the number of lung disease cases associated with vaping in the United States and U.S. Virgin Islands had expanded to 380, with six total deaths confirmed.

98.    On this news, Altria's stock price fell by 9.76%, or $4.34 per share, to close at $40.12 per share on September 19, 2019, compared to the closing price of $44.46 per share on September 12, 2019, erasing over $8.10 billion in market capitalization in five days.

99.    On September 23, 2019, the *Wall Street Journal* published an article reporting that "[f]ederal prosecutors in California are conducting a criminal probe into [JUUL]."

100.    Then, on September 25, 2019, Altria issued a press release and filed a Current Report on Form 8-K with the SEC disclosing that Philip Morris had called off discussions of a merger with Altria. The merger would have been a $200 billion transaction.  Philip Morris apparently ended discussions of the merger due to scrutiny of the e-cigarette industry and Altria's 35% stake in JUUL.  In the same press release, Altria disclosed that its Senior Vice President, and Chief Strategy and Growth Officer, defendant Crosthwaite, was stepping down from his position to join JUUL as the company's CEO.  JUUL had also announced that day that its former CEO would step down and that it would cease all advertising in the U.S.

101.    On October 14, 2019, defendant Willard stated to Congress through a letter to Senator Richard J. Durbin: "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly.  JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers.  We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products."

102.    On October 31, 2019, Altria issued a press release and filed a Current Report on Form 8-K with the SEC announcing its financial results for the third quarter of 2019.  The press release disclosed that Altria recorded a ***$4.5 billion impairment charge*** related to its investment in JUUL during the third quarter of 2019, representing over a ***35% loss in the Company's $12.8 billion investment in less than one year***.  Altria explained the charge was based upon its consideration of several impairment indicators in the totality, including, "increased likelihood of [FDA] action to remove flavored e-vapor products from the market pending a market authorization decision, various e-vapor bans put in place by certain cities and states in the U.S. and in certain international markets, and other factors."

103.    On this news, Altria's stock price fell $1.17 per share, or 2.55%, to close at $44.79 per share on October 31, 2019, compared to the previous day's closing of $45.96 per share, erasing over $2.18 billion in market capitalization in a single day.

104.    On January 30, 2020, Altria issued a press release announcing that it was taking an additional $4.1 billion charge related to its JUUL investment.  It cited "the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase."

105.    On this news, Altria's market capitalization fell another $3.9 billion, or 4.2% in a single day.

106.    Then on February 21, 2020, the *Wall Street Journal* reported that the SEC had launched an investigation into whether Altria full disclosed to its shareholders the risks associated with the JUUL Investment.  Over the next three days, from February 21, 2020 to February 25, 2020, Altria would lose another $6.8 billion, representing nearly 8% of its market capitalization.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## REASONS THE STATEMENTS WERE IMPROPER

107. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Altria Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     JUUL's marketing scheme was directed towards youths;

(b)     JUUL's products were harmful and would not lead to individuals stopping their use of tobacco;

(c)     Altria's investment in JUUL contained material risks, including litigation risks related to JUUL's youth marketing;

(d)     the value of JUUL was significantly overstated and that the severe regulatory and litigation risks would negatively impact both the value of JUUL and the Company;

(e)     Altria's agreements with JUUL violated antitrust laws; and

(f)     as a result of the above, Altria needed to write down a significant portion of the JUUL Investment.

## DAMAGES TO ALTRIA

108. As a result of the Altria Individual Defendants' improprieties, Altria disseminated improper, public statements.  These improper statements have devastated Altria's credibility as reflected by the Company's over $33 billion, or 30%, market capitalization loss.

109. In addition, Altria substantially overpaid for JUUL, as shown by its multiple multibillion-dollar write downs of the JUUL Investment.

110. Altria also damaged its reputation within the business community and in the capital markets.  Altria's current and potential customers consider a company's ability to provide tobacco products as safely as possible.  Customers are less likely to buy these products when they cause significant health problems.  In addition, Altria faces heightened regulatory scrutiny, and, as already operating in a heavily regulated industry, can ill-afford the reputational damage associated with marketing tobacco products to underage users.

111.    Further, as a direct and proximate result of the Altria Individual Defendants' actions, Altria has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the Securities Class Action;

(b)    costs incurred from defending and paying any settlement in the JUUL Actions for violations;

(c)    costs incurred from defendant defending and paying any settlement in the governmental lawsuits, including the FTC action;

(d)    costs incurred from defending and responding to governmental inquiries and investigations, including the SEC investigation; and

(e)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Altria.

## DERIVATIVE AND DEMAND MADE ALLEGATIONS

112.    Plaintiff brings this action derivatively in the right and for the benefit of Altria to redress injuries suffered, and to be suffered, by Altria as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the defendants. Altria is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

113.    Plaintiff will adequately and fairly represent the interests of Altria in enforcing and prosecuting its rights.

114.    Plaintiff has continuously been a shareholder of Altria since December 2014.

115.    On November 27, 2019, plaintiff sent the Board of Altria a litigation demand (the "Demand") detailing the wrongdoing explained herein and demanding that the Board investigate and the initiate litigation against the culpable fiduciaries.  A true and correct copy of the Demand is attached hereto as Exhibit A.

116.    Plaintiff received a response letter from Altria's counsel on December 10, 2019.  Altria's counsel confirmed receipt of the Demand.  It also requested that plaintiff provide proof that she was a

shareholder at all relevant times.   Counsel claimed that "[o]nce we receive the required proof of ownership, we will provide a further response to your letter within a reasonable time."  A true and correct copy of the December 10, 2019 letter is attached hereto as Exhibit B.

117.   Though there is no requirement that plaintiff provide the requested proof, she did so by letter dated December 18, 2019.  In the letter, plaintiff inquired as to what steps the Board "has taken thus far and plans to take in response to [plaintiff's] Demand, including whether the Board has formed a special committee to consider the demand, the membership of that committee, and when we can expect to receive a decision on the demand."  A true and correct copy of Plaintiff's December 18, 2019 letter is attached hereto as Exhibit C.

118.   On January 10, 2020, plaintiff received a letter from counsel for the Board.  According to the letter, the Board decided it would not undertake to consider the merits of the Demand until some undisclosed time "[a]fter there have been further developments in [the related] proceedings."  A true and correct copy of the January 10, 2020 letter is attached hereto as Exhibit D.

119.   Plaintiff replied by letter that same day.  Plaintiff explained that the Board's position made little sense, as any decision in response to the Demand would require it to be adequately informed as to the underlying facts.  In particular, plaintiff's January 10, 2020, letter stated:

> While it may be the case that it's in the best interests of the Company to mount a defense to all allegations, we question how the Board could make such a determination without a complete and thorough investigation into the underlying facts. Further, we fail to see why a defense of litigation would prevent the Board from conducting its own internal investigation. Accordingly, we ask the Board to reconsider and conduct the demanded investigation.

A true and correct copy of plaintiff's January 10, 2020 letter is attached hereto as Exhibit E.

120.   On January 24, 2020, the Board reiterated its refusal to investigate plaintiff's Demand. Without explaining why the Board could not conduct an investigation while Altria defended itself, the Board again relied on this excuse to deny plaintiff's request for reconsideration of the Board's deferral of the investigation.  Citing a number of cases that did not concern Virginia law, the Board claimed that the refusal to conduct an investigation is within its business judgment.  A true and correct copy of the Board's January 24, 2020 letter is attached hereto as Exhibit F.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

121.    Plaintiff responded via letter on January 27, 2020.  In her letter, plaintiff explained that since Altria is incorporated in Virginia, Virginia's laws regarding shareholder litigation demands and derivative actions apply to the Board.  Plaintiff further explained that Virginia law provides the Board with ninety days to consider and substantively respond to a shareholder demand or the shareholder is free to file a derivative action, citing Va. Code §13.1-672.1.  Thus, as detailed in plaintiff's letter, the Board's refusal to consider the Demand within the ninety days amounts to a wrongful refusal.  A true and correct copy of plaintiff's January 27, 2020 letter is attached hereto as Exhibit G.

122.    Plaintiff has not received a further response.  It has been over the ninety days plaintiff is required to wait before filing a derivative action.  In light of the Board's refusal to consider plaintiff's Demand in a timely and appropriate manner, it has effectively wrongfully refused the Demand.

123.    Plaintiff has not made any demand on the other shareholders of Altria to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Altria is a publicly held company with over 1.8 billion shares outstanding and thousands of shareholders as of July 24, 2020;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Altria Individual Defendants for Breach of Fiduciary Duty

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    The Altria Individual Defendants owed and owe Altria fiduciary obligations.  By reason of their fiduciary relationships, the Altria Individual Defendants owed and owe Altria the obligation to act in good faith.

126.    The Altria Individual Defendants and each of them, violated and breached their fiduciary duties.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

127.    As a direct and proximate result of the Altria Individual Defendants' breaches of their fiduciary obligations, Altria has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

128.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

## COUNT II

**Against the JUUL Defendants for Aiding and Abetting Breach of Fiduciary Duty**

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

130.    The Altria Individual Defendants and each of them, violated and breached their fiduciary duties.

131.    The JUUL Defendants knowingly participated in the Altria Individual Defendants breaches of fiduciary duty.

132.    As a direct and proximate result of the Altria Individual Defendants' breaches of their fiduciary obligations and the JUUL Defendants aiding and abetting thereof, Altria has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

133.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

## COUNT III

**Against the Altria Individual Defendants for Waste of Corporate Assets**

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    As a result of the wrongdoing detailed herein, the Altria Individual Defendants have caused Altria to waste its assets by overpaying for the JUUL Investment, as well as improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty and forced Altria to overpay for its JUUL Investment.

136.    As a result of the waste of corporate assets, the Altria Individual Defendants are liable to the Company.

137.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### COUNT IV

### Against the Altria Individual Defendants for Unjust Enrichment

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    By their wrongful acts and omissions, the Altria Individual Defendants were unjustly enriched at the expense of and to the detriment of Altria.  The Altria Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Altria.

140.    Plaintiff, as a shareholder and representative of Altria, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

141.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Altria, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, aiding and abetting of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.    Directing Altria to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Altria and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over the prevention of marketing to underage individuals;

2.    a proposal to strengthen the Company's controls over its acquisitions so that its targets are not involved in underage marketing and valued correctly;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1          3.       a proposal to strengthen Altria's oversight of its disclosure procedures;

2          4.       a proposal to strengthen the Board's supervision of operations and develop and

3    implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4          5.       a provision to permit the shareholders of Altria to nominate at least three

5    candidates for election to the Board;

6          C.       Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state

7    statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on,

8    or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure

9    that plaintiff on behalf of Altria has an effective remedy;

10          D.       Awarding to Altria restitution from defendants, and each of them, and ordering

11   disgorgement of all profits, benefits, and other compensation obtained by the defendants;

12          E.       Awarding to plaintiff the costs and disbursements of the action, including reasonable

13   attorneys' fees, accountants' and experts' fees, costs, and expenses; and

14          F.       Granting such other and further relief as the Court deems just and proper.

15                                **JURY DEMAND**

16          Plaintiff demands a trial by jury.

17    Dated: August 27, 2020                    ROBBINS LLP
                                                BRIAN J. ROBBINS
18                                              CRAIG W. SMITH
                                                SHANE P. SANDERS
19                                              EMILY R. BISHOP

20
                                                      */s/Brian J. Robbins*
21                                              BRIAN J. ROBBINS

22                                              5040 Shoreham Place
                                                San Diego, CA 92122
23                                              Telephone: (619) 525-3990
                                                Facsimile (619) 525-3991
24                                              E-mail: brobbins@robbinsllp.com
                                                         csmith@robbinsllp.com
25                                                       ssanders@robbinsllp.com
                                                         ebishop@robbinsllp.com
26
                                                Attorneys for Plaintiff
27
     1476543
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Maria Cecilia Lorca, hereby declare as follows:

I am the plaintiff in this action. I have read the verified shareholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: <u>   8/26/2020                       </u>

DocuSigned by:

*Maria Cecilia Lorca*

6793638190694E8...
MARIA CECILIA LORCA